IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:16-CR-169 |
| v. | ) | |
| | ) | Honorable Gerald Bruce Lee |
| RAUSHI J. CONRAD, | ) | |
| | ) | Sentencing: September 8, 2017 |
| Defendant. | ) | |

<u>POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING</u>

Defendant RAUSHI J. CONRAD engaged in a serious and protracted corruption scheme whereby he sought out and accepted bribes from co-conspirator James Bedford in exchange for ensuring that Bedford's company was awarded and maintained a lucrative data-migration contract to perform work for the Department of Commerce ("DOC"). By engaging in this conspiracy, CONRAD corrupted the process by which the government obtains critical services, undermined the rule of law, subverted the free market that is the hallmark of our economy, and betrayed the trust placed in him as a public official. The government accordingly asks that this Court impose a sentence within the advisory guideline range of 121 to 151 months to appropriately reflect the seriousness of the offense, afford adequate deterrence, and avoid unwarranted sentencing disparities.

The government, moreover, respectfully requests that the Court impose a restitution judgment of $1,079,161.02 to reimburse the DOC for the actual losses it sustained as a result of the defendant's corruption.[1]

---

[1] By separate motion, the government is also seeking a forfeiture judgment in the amount of $224,533.75 to disgorge the defendant's ill-gotten gains from the conspiracy. *See* Dkt. No. 100.

## I.    Background

On July 28, 2016, a grand jury indicted CONRAD with one count of conspiracy to commit bribery, in violation of 18 U.S.C. § 371, and one count of acceptance of bribes by a public official, in violation of 18 U.S.C. § 201(b)(2)(A).  Dkt. No. 1.  The case proceeded to trial before a jury beginning on June 12, 2017.  Dkt. No. 89.  On June 15, 2017, a jury convicted the defendant of both counts in the indictment.  Dkt. No. 94.

## II.    Sentencing Argument

Although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing.'"  *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 543 U.S. at 264).  The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The sentencing court, however, "may not presume that the Guidelines range is reasonable."  *Nelson v. United States*, 555 U.S. 350, 352 (2009).  The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence.  *Id.; see also Clark*, 434 F.3d at 685.  Ultimately, the sentence imposed must meet a standard of reasonableness.  *See Booker*, 543 U.S. at 260-61.

### A.    Guidelines Range

The Presentence Investigation Report ("PSR") correctly finds that the advisory guideline range in this case is 121 to 151 months, predicated on a base offense level of 14, U.S.S.G. § 2C1.1(a)(1), a 14-level increase based on the more than $1,000,000 in profit that CONRAD steered to his co-conspirator James C. Bedford in exchange for the bribe payments,

2

§§ 2C1.1(b)(2), 2B1.1(b)(1)(H), a 4-level increase because the offense involved a public official

in a high-level decision-making position, § 2C1.1(b)(3), and the absence of any credit for

acceptance of responsibility.  Because the defendant challenges only the enhancements under

§ 2C1.1(b)(2) and § 2C1.1(b)(3) this memorandum will address only those enhancements.

### 1.    The PSR Correctly Applies a 14-Level Enhancement Based on the Benefit CONRAD Steered to Bedford's Company.

The PSR correctly applies a 14-level enhancement based on the amount of profit that

CONRAD steered to his co-defendant, James C. Bedford, in exchange for the bribes the

defendant received.  Section 2C1.1(b)(2) provides:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

U.S.S.G. § 2C1.1(b)(2).  The application notes to § 2C1.1 further explain that "[t]he value of 'the

benefit received or to be received' means the net value of such benefit."  § 2C1.1 note 3.  The

application notes also give one particularly apt example of how the net value should be

calculated: "A $150,000 contract on which $20,000 profit was made was awarded in return for a

bribe; the value of the benefit received is $20,000."  *Id.*

The evidence at trial proved overwhelmingly that CONRAD solicited and accepted

bribes from Bedford in exchange for steering the data migration contract to Bedford's Images

Inc. ("BI"), and for ensuring that BI continued to receive work under the contract long after it

became apparent that the quality of the work being performed was woefully inadequate.

3

Accordingly, the benefit received in exchange for those bribes was the profit that Bedford and his company reaped under the data migration contract.

The evidence at trial showed that BI was paid $1,138,724.14 in revenues under the contract, and that the company's total out-of-pocket costs related to that work were $59,563.13. GX 604. Accordingly, BI obtained $1,079,161.02 in profits under the contract, which was "the benefit received . . . in return for the [bribe] payment[s]" that CONRAD solicited. GX 604; § 2C1.1(b)(2); *id.* note 3. This triggers a 14-level increase under the Guidelines. *See* 2B1.1(b)(1)(H).

CONRAD objects that this amount should not be assessed to him because he was unaware of the extent of profit that Bedford was extracting under the contract. Neither the facts nor the law support the defendant's argument. First, the facts show that CONRAD was well aware that the data migration project presented a golden opportunity for Bedford and his company to profit handsomely. CONRAD had access to the budget of the Bureau of Industry and Security ("BIS"), and therefore knew how much it had to spend on an outside vendor. CONRAD himself drafted the scope of work, dictating the size of the project that BI would perform.

CONRAD also prevented other companies from bidding on the initial contract, thereby ensuring not only that BI won the work, but that it did so at an inflated, super-competitive price. And after it became apparent that the work being done by BI was woefully inadequate, *see, e.g.*, GXs 102, 103, 104, CONRAD continued personally to deliver more files to Bedford, thereby allowing BI to continue to bill for defective services.

Moreover, after BI had blown through the entire budget initially allocated for the project, and long after CONRAD knew of the terrible quality of the work, CONRAD sought and

obtained yet more funding for BI to perform yet more subpar work. *See* GX 117. And all the while, CONRAD was soliciting and receiving hundreds of thousands of dollars in bribes from Bedford, bribes that CONRAD knew he could extract only if he had something extraordinarily profitable to give Bedford in return. In light of CONRAD's intimate involvement with every aspect of the data migration project, and his actions in demanding bribes connected to that project, it is clear that he was aware of what a golden opportunity he had to offer Bedford.

Second, the law does not require the government to prove that CONRAD performed a detailed accounting of BI's profits before the enhancement under § 2C1.1(b)(2) applies. To the contrary, Chapter 1 of the Sentencing Guidelines Manual sets forth the general principles that apply when calculating a guideline range. The Guidelines instruct, in relevant part:

> Unless otherwise specified . . . specific offense characteristics . . . shall be determined on the basis of the following:
>
> > . . . .
>
> > in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> > (i)     within the scope of the jointly undertaken criminal activity,
>
> > (ii)     in furtherance of that criminal activity, and
>
> > (iii)    *reasonably foreseeable* in connection with that criminal activity;
>
> > that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

§ 1B1.3(a)(1) (emphasis added). Thus, the test is merely whether it was "reasonably foreseeable" to CONRAD that Bedford would obtain the profits he received, not whether CONRAD had an accounting report that showed him the precise amount of that profit. For all of

the reasons discussed above, BI's profits were more than foreseeable to CONRAD. This Court therefore should apply the 14-level enhancement under § 2C1.1(b)(2) and 2B1.1(b)(1)(H).

### 2. The PSR Correctly Finds That the Offense Involved a Public Official in a High-Level Decision-Making Position.

The PSR also correctly applies a 4-level enhancement pursuant to § 2C1.1(b)(3). That section provides, in relevant part, "If the offense involved an elected public official or any public official in a high-level decision-making or sensitive position, increase by 4 levels." *Id*. Application Note 4(A) to § 2C1.1 defines "high-level decision-making or sensitive position" to mean "a position characterized by direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, *or by a substantial influence over the decision-making process*." § 2C1.1 note 4(A) (emphasis added). As the probation officer has found, and as the government showed in vivid detail at trial, CONRAD held substantial influence over all aspects of the data migration contract, the award of that contract to BI, and the decision to continue to feed work to BI long after it became clear that the quality of the work being done under the data migration contract was quite poor.

During the conspiracy, CONRAD served as the Director of Systems Operation and Security at BIS within the DOC. In that role, CONRAD held the responsibility for, among other things, the BIS's computer networks, computer system security, and the design, development, testing, documentation, and implementation of information technology related products. *See* Ex. A attached hereto (sworn affidavit of CONRAD from a prior administrative DOC investigation wherein CONRAD describes the broad scope of his responsibilities). By virtue of this position and all of the responsibility that it entailed, CONRAD was designated as the project manager within the BIS in charge of overseeing the BIS's data migration project. In that role, CONRAD had the ability to control, either directly or indirectly by exerting pressure on or providing advice

to other public officials, the design of the project, the information that was shared with other public officials regarding the progress and performance of the project, whether to hire an outside contractor or subcontractor to perform the work, which contractor or subcontractor to hire, whether to continue to provide that contractor or subcontractor additional work to perform as a part of the data migration project, and whether to allocate funding to pay for data migration work.

These facts demonstrate that the enhancement clearly applies. For example, in *United States v. Matzkin*, 14 F.3d 1014 (4th Cir. 1994), a defendant had bribed a supervisory engineer at the Navy who had responsibility for the technical aspects of major procurements. *Id*. at 1016. In return, the engineer passed nonpublic information to the bribe payer, recommended to a contract review panel that the bribe payer's clients win contracts, and sought to ensure that certain contracts were awarded on a sole-source basis, *i.e.*, without competition. *Id*. at 1016-17. The Fourth Circuit held that the engineer's ability to pass on non-public information and to make recommendations to the Navy about who should be awarded the contracts meant that the enhancement applied. *Id*. at 1021.

In reaching this conclusion, moreover, the court rejected the defendant's argument that the enhancement should not apply because the Naval engineer lacked the power to award contracts on his own. The court explained, "Although [the Contract Award Review Panel ("CARP") on which the engineer served] could not make the final decision that the contracts should be awarded to a particular bidder, senior Navy officials would not likely accept the bid without a favorable report from CARP." *Id*. at 1021.

The evidence here presents an even more compelling case for applying the enhancement than the facts at issue in *Matzkin*. As noted in the PSR and as shown in detail at trial, CONRAD

wielded almost complete control over both the awarding of the data migration contract and over Bedford's continued ability to perform work under that contract. CONRAD decided whether to hire an outside contractor in the first instance, rather than performing the work in-house. CONRAD approached Bedford's company—and only Bedford's company—about the data migration opportunity. When CONRAD raised the issue of hiring an outside vendor with his subordinate at the BIS, he identified only BI as a vendor who might do the work. And when CONRAD contacted SPAWAR to arrange for the contract to be issued, he directed his contact at SPAWAR to hire BI. As the SPAWAR representative testified, he arranged to have BI hired because CONRAD told him to do so. In short, CONRAD exercised considerably more influence in passing non-public information to the bribe payer, in preventing any competition in the acquisition process, and in ensuring that the bribe payer's company was hired than the Naval engineer at issue in *Matzkin*.

Moreover, CONRAD wielded influence not only in the award of the contract but also in its performance. As the defendant's coworkers explained, they repeatedly complained to him about rampant problems with the data migration process, and yet he continued to feed work (and therefore money) to BI. There is no indication that the Naval engineer at issue in *Matzkin* enjoyed similar influence over the performance of the corruptly awarded contracts after they were issued.

Despite this evidence, CONRAD's counsel argues that the enhancement should not apply because CONRAD had to seek approval from his supervisors, and therefore lacked the ultimate power to grant the contract to BI. As a factual matter, that is simply incorrect. CONRAD's supervisor Mr. Donnell testified at trial that CONRAD had complete control over the data migration project, and that Mr. Donnell was not even aware of who had been hired to perform

the work.  And although SPAWAR had the direct authority to award the contract, the

defendant's contact at SPAWAR testified that he viewed CONRAD as his informal boss, and

that he sought to carry out CONRAD's directives.

More importantly, CONRAD's lack of *de jure* authority to award the contract on his own

is irrelevant.  The Fourth Circuit made this point clear in *Matzkin*, where it ruled that the Naval

engineer held a high-level decision-making position notwithstanding that he lacked the power to

award contracts on his own.  *Matzkin*, 14 F.3d at 1021.  Similarly, Application Note 4(A) of

§ 2C1.1 makes plain that final decision-making authority is not the test; rather, the public official

need only exercise "substantial influence" over the process.  U.S.S.G. § 2C1.1 note 4(A).

Because the facts here show that CONRAD wielded almost total *de facto* control over the data

migration project, the enhancement should be applied.

Accordingly, the final offense level is 32, and the advisory guideline range is 121 to 151

months.

> **B.    CONRAD's Bribery Scheme Caused an Actual Loss to the Department of Commerce of at Least $1,079,161.02 Which Must Now Be Repaid in Restitution.**

The evidence at trial further showed that the defendant, during and in the course of the

bribery conspiracy, caused actual losses to the DOC of at least $1,079,161.02.  The Court should

therefore order CONRAD to repay this amount in restitution.

The government's position regarding restitution is based on the commonsense principle

that the government is entitled to get what it pays for.  And where, as here, the government

vastly overpays for services that are virtually worthless because of a defendant's corrupt actions,

the difference between what the government paid and the value of what it actually received is an actual loss that must be repaid in restitution.

Full restitution to the government is required in this case by the Mandatory Victim Restitution Act ("MVRA"), which provides that a district court "shall order . . . that the defendant make restitution to the victim[s] of the offense" upon conviction for any "offense against property, . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)-(B); *United States v. Roper*, 462 F.3d 336, 337-38 (4th Cir. 2006) ("[A] restitution order imposed under the MVRA is mandatory."). The MVRA provides that "[a]n order of restitution under this section shall be issued and enforced in accordance with [18 U.S.C. §] 3664." § 3663A(d). Section 3664, in turn, provides that "[i]n each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." § 3664(f)(1)(A); *see Roper*, 462 F.3d at 339 (noting that the MVRA removed district courts' discretion to order restitution for less than the full amount of the victims' losses, even when defendants lack the ability to pay). Moreover, the Fourth Circuit has confirmed that restitution is mandatory even where forfeiture is also imposed. Restitution and forfeiture serve separate and distinct goals (to compensate victims, and to punish wrongdoers, respectively), so imposition of both penalties does not amount to a double recovery. *See United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014).

Under the MVRA, "a victim is defined broadly," *United States v. Duncan*, 578 F. App'x 183, 191 (4th Cir. 2014) (citing § 3663A(a)(2)), and includes any "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or

pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern," § 3663A(a)(2).  Importantly, "[t]his language authorizes a district court to include in the restitution order the losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme.  In other words, each member of the conspiracy that in turn causes property loss to a victim is responsible for the loss caused by that conspiracy."  *Duncan*, 578 F. App'x at 191 (citations omitted).

To award restitution, the Court need only find the losses sustained by the DOC by a preponderance of the evidence.  *See* 18 U.S.C. § 3664(e).  Moreover, in calculating restitution under the MVRA, "[a]bsolute precision is not required."  *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005); *United States v. Gallant*, 537 F.3d 1202, 1252 (10th Cir. 2008) (same). Rather, a district court's obligation is "to attempt to come to a 'reasonable determination of appropriate restitution by resolving uncertainties with a view towards achieving fairness to the victim.'"  *Burdi*, 414 F.3d at 221 (quoting *United States v. Vankin*, 112 F.3d 579, 587 (1st Cir. 1997) (requiring only a "modicum of reliable evidence" in fixing the amount of restitution due), *abrogated on other grounds by United States v. Anonymous Defendant*, 629 F.3d 68 (1st Cir.2010)).  As the Second Circuit has explained, it is the "settled understanding among the courts of appeals" that imposition of restitution under "the MVRA requires only a reasonable approximation of losses by a sound methodology."  *United States v. Gushlak*, 728 F.3d 184, 195, 196 (2d Cir. 2013).  In other words, "[t]he law cannot be blind to the fact that criminals rarely keep detailed records of their lawless dealings, totaling up every column and accounting for ever misbegotten dollar.  Hence, the preponderance standard must be applied in a practical, common-sense way.  So long as the basis for reasonable approximation is at hand, difficulties in achieving

exact measurements will not preclude a trial court from ordering restitution." *United States v. Savoie*, 985 F.2d 612, 617 (1st Cir. 1993), *quoted in United States v. Posnanski*, 217 F.3d 842, 2000 WL 977404, at *1 (4th Cir. July 17, 2000) (Table) (unpublished) *and United States v. Mejia*, 326 F. App'x 710, 712 (4th Cir. 2009).

The evidence at trial makes clear that the defendant's corrupt actions caused a substantial monetary loss to the DOC.  CONRAD wielded extensive control over the entirety of the data migration project, and used that control to corrupt the process in several important respects. First, the defendant decided whether the data migration work would be performed in-house by DOC's employees, or whether the DOC instead would hire a private contractor to do the work. By choosing to hire an outside vendor, CONRAD caused the DOC to pay for services of dubious quality that its own employees could have done at least as well—or far better—for free.

Second, the defendant controlled the process for selecting an outside vendor to perform the data migration work.  Ordinarily, that process would have required the government to solicit bids or quotes from at least three vendors, thereby ensuring meaningful competition in the price and the quality of services offered.  Instead of following that process, CONRAD insisted that Bedford's Images, Inc. ("BI") be hired, notwithstanding that BI had no track record of performing information technology related work for the DOC, and even though BI lacked any staff with experience in performing data migration work.

Third, the defendant ignored other obvious options, never approaching or seeking bids from any of several other information technology companies that had established track records of performing quality work for the DOC.  Indeed, the defendant never broached the subject of the data migration project with the company that designed, built, and maintained the new network onto which the data was being transferred.  As a direct consequence of the defendant's corrupt

actions, an unqualified vendor was awarded a contract at a price never subjected to any meaningful competition.

The results of the defendant's corruption were predictably dismal.  Rather than seeking out highly qualified personnel to perform the work, Bedford retained his friends and neighbors to do the job, most of whom had no specialized training or expertise relating to computers or data migration, or, if they had such training, were not applying it in performing the work.  Bedford gave them minimal guidance about what they were supposed to do, and provided them with off-the-rack PDF conversion software purchased at Office Depot for a grand total of $209.97.  *See* GX 20.  The data migration contractors often did not understand the purpose of the work they were performing, describing it as monotonous, tedious, and seemingly pointless.

It is therefore no surprise that the quality of the work was terrible.  As several witnesses testified at trial, numerous files that were supposed to have been transferred to the new system were missing, formatted incorrectly, had unreadable characters, or had lost their native functionality, rendering them useless.  In some instances, DOC employees gave up and simply recreated their files from scratch.  And as the defendant's co-worker Kim Sins explained, the rampant problems with the work were never fixed.

Fourth, the defendant sought to prevent his DOC colleagues from learning what was really happening with the data migration work.  When the defendant's supervisor, Eddie Donnell, asked to see the process that the data migration vendor was using to perform the work, the defendant falsely informed Mr. Donnell that he could not see the process because it was

proprietary. Even after the defendant's colleague Ms. Sins was assigned to oversee the project, she had no direct access to the vendor, and had to route all of her inquiries through the defendant.

Finally, long after it became apparent that the quality of the work was unacceptable, the defendant continued to feed batch after batch of files to Bedford, thereby enabling BI to continue to overbill the government for work that it never should have been awarded in the first instance.

In sum, the net effect of the defendant's corrupt actions was to cause the DOC to pay more than $1.1 million to have a handful of untrained laypersons with virtually no guidance use standard PDF conversion software to convert files into formats that were largely unusable. It is therefore clear that the defendant's corruption caused a dramatic actual loss to the DOC.

Quantifying the loss, moreover, is relatively straightforward: the loss is the difference between what the government paid and the value of what it actually received. Given the woeful quality of the work and the absence of expertise by the persons who performed that work, there is a plausible argument that the government received nothing of value whatsoever, and that the losses are the entire cost of the data migration project.

The government, however, has elected to take a more measured approach, and instead asserts that the value of what it received is equal to what James Bedford paid for the goods and services he used in performing the data migration work. The Eleventh Circuit followed a similar approach in *United States v. Hale*, 618 F. App'x 521, 524–25 (11th Cir. July 8, 2015). The defendant in *Hale* had been convicted of accepting kickbacks (a form of commercial bribery) in exchange for steering contracts to perform work for his employer to an unqualified vendor. The vendor in turn hired a subcontractor who actually performed the work, and the vendor then

significantly marked up the price it paid the subcontractor when billing the defendant's employer. *Id.*

The Eleventh Circuit held that the district court correctly found that the loss for purposes of restitution was the profits that the members of the kickback conspiracy had obtained by inflating the price of the work performed. The court found that the methodology for calculating the restitution award was sound, and rested on the reasonable inference that, in the absence of the kickback scheme, the employer could have hired the subcontractor directly at the same price paid by the defendant. *Id.*

That reasoning applies with at least equal force here. It is unclear whether the DOC, if fully apprised of the facts, would have paid anything at all for untrained laypersons to convert files to unusable formats. But if the DOC would have paid anything at all, the best estimate of what it would have paid (and the best estimate of the true value of what the government actually received) is the price Bedford himself paid for the software and services he used in performing the work. The evidence at trial showed that Bedford paid a grand total of $59,563.12 for the labor and materials used in the data migration project. Accordingly, the loss suffered by the DOC is the difference between what it paid ($1,138,724.14) and what it actually received (software and labor worth no more than $59,563.12), for a total loss of $1,079,161.02. *See* GX 604. This Court should impose a restitution judgment in that amount.

## C.   Section 3553(a) Factors

Section 3553(a) of Title 18 directs that "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" that section. In this case, the § 3553(a) factors counsel strongly in favor of a sentence within the advisory guideline range of 121 to 151 months. Although all of the statutory factors support such a sentence, in particular

the nature and circumstances of the offense, the history and characteristics of the defendant, the need to afford adequate deterrence, and the Court's duty to consider the range recommended by the Sentencing Guidelines, all support such a punishment.

### 1.    The Nature And Circumstances Of The Offense.

The nature and circumstances of the offense committed by CONRAD cannot be overstated.  CONRAD engaged in a protracted corruption conspiracy whereby he sought out and received bribes in the form of secret payments and free renovation work at his house.  In exchange for these bribes, the defendant violated his duties as a federal official, betrayed the trust of the public and his co-workers, and ensured that the bribe payer's company won a no-bid contract to do work for the DOC that it was unqualified to perform.

CONRAD chose to engage in this corruption, moreover, in relation to a critical function of the DOC.  As noted at trial, a significant computer intrusion that infected the computer systems of the BIS caused the BIS to need to create an entirely new, uninfected computer system.  Once that system was created, BIS employees needed access to their files on the old system so that they could continue to perform their mission.  The data migration project was intended to ensure that the employees' critical files were moved from the infected network to the new network in a way that ensured that the virus was removed, but that the files remained useable.

Rather than working to ensure that this project was carried out successfully, CONRAD exploited the opportunity to enrich himself.  And in the process, his actions caused the DOC to receive a product that was all but worthless.

The defendant further aggravated an already serious crime when he was initially approached by the government in this case. In 2011, when confronted by law enforcement, he lied about his relationship with Bedford and Bedford's companies:

> WRIGHT:     What's your – what's your outside relationship with Team America?
>
> CONRAD:     I don't really have one with Team America other than, hey, they do work and I send them files that they do for us and I say okay here's the files and do whatever for Team America. So I don't really have one specifically with Team America . . . .

GX 42-T; *see also* GX 42-1. Prior to that interview, the defendant already had received well over $200,000 worth of bribes routed through Team America. *See* GX 601 (summary chart showing things of value from Team America to the defendant). While the defendant had every right to decline to speak to investigators, he chose instead to speak falsely.

Thus, the defendant's crime caused harm both in terms of the economic losses sustained by the government, and also in terms of the way in which it undermined the rule of law and the public's faith in the honest functioning of its government. As the Eleventh Circuit recently held:

> Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. Putting aside the financial havoc it can cause, bribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently. And that harm, though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014). A substantial sentence is therefore necessary to reflect the severe harm caused by the defendant's crimes.

### 2.      The History and Characteristics of the Defendant

A consideration of the defendant's history and characteristics also support a lengthy sentence. Unlike many defendants who come before this Court, CONRAD has enjoyed the type of success that ordinarily leads people to engage in productive, law abiding lives. At the time he

committed the crimes at issue in this case, the defendant was employed as a GS-15 earning more than $140,000 per year.  PSR ¶ 62.  The defendant also was then operating his restaurant business, which the defendant claims to have earned roughly $250,000 per year.  *Id.* ¶ 61.  The defendant's decision to commit the crimes in this case are therefore all the more galling.

The defendant, moreover, has expressed no remorse whatsoever for his actions.  It is well-settled that "lack of remorse is a fact that a district court can consider in its evaluation of the § 3553(a) factors."  *United States v. Sweat*, 573 F. App'x 292, 298 (4th Cir. 2014); *see also United States v. Keskes*, 703 F.3d 1078, 1090–91 (7th Cir. 2013) ("A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform) and deterrence (a remorseful criminal is less likely to return to his old ways).'" (citation omitted)); *United States v. Smith*, 424 F.3d 992, 1016–17 (9th Cir. 2005) (approving district court's above-Guidelines sentence in a tax protestor fraud case based in part on defendant's lack of remorse).

### 3.    The Need for the Sentence Imposed to Afford Adequate Deterrence.

A significant sentence is also necessary to ensure that other, similarly situated public officials will be adequately deterred from committing similar crimes.  Put differently:

> We need not resign ourselves to the fact that corruption exists in government.  Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable.  The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.  Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants.  It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all – not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006).  Given the difficulty in detecting public corruption, anything less than a Guideline sentence in this case could easily lead other public officials to believe that the potential benefits of corruption outweigh the costs.  As such, a sentence within the Guideline range is necessary for general deterrence.

### 4.    A Sentence Within the Advisory Range Best Avoids Unwarranted Sentencing Disparities

Finally, the sentencing guidelines, though merely advisory, offer a valuable tool for ensuring that similarly situated offenders are treated similarly.  Although the guidelines carry no presumption of reasonableness, they are the starting point and initial benchmark used by this and every other federal court in the country.  Moreover, they are the only factor among those listed in § 3553(a) that provides a quantifiable metric by which to impose a sentence.  "Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly.  That was the main goal of the Sentencing Reform Act.  The more out-of-range sentences that judges impose after *Booker*, the more disparity there will be."  *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006).  Thus, although the Guidelines themselves are not mandatory, a sentence within the advisory range best serves the statutory interest of avoiding "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

### III.    Conclusion

Based on the foregoing, the government respectfully recommends that the Court impose a sentence within the advisory guideline range of 121 to 151 months.  The government further respectfully requests that the Court impose a restitution judgment of $1,079,161.02 to reimburse the DOC for the actual losses it sustained as a result of the defendant's corruption.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:           /s/
          Matthew Burke
          Jamar K. Walker
          Assistant United States Attorneys
          Eastern District of Virginia
          Counsel for the United States of America
          United States Attorney's Office
          2100 Jamieson Avenue
          Alexandria, VA 22314
          Tel.: (703) 299-3700
          Fax:  (703) 299-3981

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of September, 2017, I electronically filed the

foregoing document with the Clerk of Court using the CM/ECF system, which will send a

notification of such filing (NEF) to all counsel of record.

A copy also will be sent via email to:

              Quentin T. Lowe
              United States Probation Officer
              Quentin_Lowe@vaep.uscourts.gov


              _____/s/_____
              Jamar K. Walker
              Assistant United States Attorney