1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                         ALEXANDRIA DIVISION

3  UNITED STATES OF AMERICA,     )  Case 1:16-cr-00169
                                 )
4                  Plaintiff,    )
                                 )
5        v.                      )  Alexandria, Virginia
                                 )  September 8, 2017
6  RAUSHI J. CONRAD,             )  10:10 a.m.
                                 )
7                  Defendant.    )
   _____)  Pages 1 - 39
8

9                    TRANSCRIPT OF SENTENCING

10          BEFORE THE HONORABLE GERALD BRUCE LEE

11            UNITED STATES DISTRICT COURT JUDGE

12
   APPEARANCES:
13
   FOR THE PLAINTIFF:
14
        MATTHEW BURKE, ESQUIRE
15      JAMAR K. WALKER, ESQUIRE
        OFFICE OF THE UNITED STATES ATTORNEY
16      2100 Jamieson Avenue
        Alexandria, Virginia  22314
17      (703) 299-3700

18  FOR THE DEFENDANT:

19      JONATHAN A. SIMMS, ESQUIRE
        THE SIMMS LAW FIRM, PLC
20      10560 Main Street, Suite 510
        Fairfax, Virginia  22030
21      (703) 383-0636

22  THE DEFENDANT, RAUSHI J. CONRAD, IN PERSON

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1              THE CLERK:  Criminal Case 1:16-cr-00169,

2    *United States of America v. Raushi J. Conrad*.

3              MR. BURKE:  Good morning, Your Honor.  Matt

4    Burke and Jamar Walker on behalf of the United States.

5              THE COURT:  Good morning.

6              MR. SIMMS:  Your Honor, good morning.

7    Jonathan Simms on behalf of Mr. Conrad, who is present

8    in court.

9              THE COURT:  Good morning, Mr. Conrad.

10             Good morning, Mr. Simms.

11             Mr. Simms, have you and Mr. Conrad reviewed

12   the presentence report?

13             MR. SIMMS:  We have, Your Honor.

14             THE COURT:  Are there any objections to the

15   report?

16             MR. SIMMS:  Yes, Your Honor, there's two

17   objections.

18             THE COURT:  All right.  I'm listening.

19             MR. SIMMS:  Your Honor, the first objection

20   deals with the presentence report recommendation that

21   Mr. Conrad qualifies as a high-ranking official in

22   terms of his conviction.  Your Honor, the objection

23   deals with the application note that states that the

24   increase is appropriate if a person is in a position

25   characterized by direct authority to make decisions

1  for, or on behalf of, a government department, agency,

2  or other government entity, or by substantial influence

3  over the decision-making process.

4          Your Honor, I do not believe that that's the

5  evidence as it came in at trial.  Mr. Conrad had at

6  several times at least two individuals over his

7  decision-making authority and certain processes that he

8  had to go through prior to decisions being made.

9          Furthermore, in terms of the procurement of

10  the contract that was ultimately awarded to Bedford's

11  Images, Your Honor, Kim Bryant took the stand and

12  testified that Raushi Conrad had no authority over who

13  would receive the subcontract position.  As a matter of

14  fact, Kim Bryant said he had no authority, no say over

15  who would get that position.

16          He did state that he received a call from

17  Mr. Conrad in respect to Bedford's Images about their

18  ability to perform the contract and he took that in

19  mind, but the ultimate decision-making was up to Henry

20  Hodor, the individual who was the owner of Tridea

21  Works, the prime contractor in this case.

22          Considering that information, Your Honor, and

23  the testimony as it came in at trial, I would say that

24  Mr. Conrad was not a high-ranking individual.

25          THE COURT:  Well, I understand why you make

1  that argument, but I guess the question becomes whether

2  SPAWAR would have hired Bedford's Images if their name

3  was not suggested by Mr. Conrad.  Can you address that

4  question?

5          MR. SIMMS:  Yes, Your Honor.  I think that

6  that was the decision that the jury made in convicting

7  Mr. Conrad.  However, I would state that --

8          THE COURT:  What decision do you think the

9  jury made?

10         MR. SIMMS:  The jury came to a decision that

11 Mr. Conrad exerted some influence in regards to

12 Bedford's Images getting that contract award.

13         THE COURT:  That's a very fair assessment,

14 and I appreciate your candor.  That's what I infer the

15 jury verdict reflected.  But under the guidelines, the

16 question is whether it is only the person who has the

17 ultimate authority to sign off on the contract to be

18 held accountable under the guideline or whether a

19 person who is in a position to influence the

20 decision-making process.

21         The government cited this case from the

22 Fourth Circuit.  Do you want to address the *Matzkin*

23 case?  It was the case where the person was employed in

24 the government.  There was a committee where they made

25 the ultimate judgment about whether to award the

1  contract.  This individual, even though he was not on

2  the committee, the people on the committee were going

3  to defer to his recommendation.  The Fourth Circuit

4  said under those circumstances that it was appropriate

5  to apply the enhancement.

6            MR. SIMMS:  Correct, Your Honor.  So in

7  *United States v. Matzkin*, Your Honor -- and I did take

8  note of that -- this was an individual who was not

9  necessarily at the decision-making point but was able

10 to, I guess, exert some influence.  I would submit that

11 this is distinguishable from Mr. Conrad because not

12 only is he just one step removed, but he was at least

13 two steps removed from being that decision maker of who

14 will receive the contract.

15           We heard testimony from Henry Hodor, the

16 owner of Tridea Works who was a prime contractor, who

17 stated he never had any conversation whatsoever with

18 Mr. Conrad.  So I would distinguish the *Matzkin* case

19 from this case because Mr. Conrad was further removed

20 from the decision-making authority than the defendant

21 in that case.

22           THE COURT:  All right.

23           MR. SIMMS:  The second argument, Your Honor,

24 that I had or objection to the presentence report would

25 be to the loss amount.  Your Honor, the presentence

6

1  report --

2        THE COURT:  What is the loss amount here?  I

3  had the impression that work was done by Bedford's

4  Images.  So this is not a case where no work was done.

5  I had the impression that the government never brought

6  any action against Bedford's Images to recover any

7  funds.  So what are we talking about here?

8        MR. SIMMS:  Your Honor, the loss amount as

9  stated in the presentence report is $1,079,161.02.

10        THE COURT:  That's the profit that Bedford's

11  Images made?

12        MR. SIMMS:  Yes, exactly.  They're using that

13  as a loss amount, and I take issue with that for two

14  reasons.  One -- and this goes towards the restitution

15  as well -- because the government did receive a

16  benefit.  There was work that was done.  Now, what

17  Mr. Bedford chose to do, unbeknownst to Mr. Conrad and

18  anybody else, was to inflate invoices and to further

19  pad his pockets illegally by submitting false invoices

20  for work that was not done.

21        Now, the government has been working on this

22  case for over 5 years now, and Mr. Bedford has admitted

23  to them for over 2 years now that he inflated those

24  invoices.  With all of their accountants and resources

25  that they have, no one attempted to figure out or

1  differentiate the profit from the loss of the

2  government.  Instead, they just submit to the Court,

3  Well, whatever we paid Mr. Bedford, that's what we

4  lost.

5           That can't be the case.  That can't be the

6  case because work was being done.  While the government

7  will stand up here and say, Well, the work was a shoddy

8  job and it wasn't done well.  Well, yeah, there were

9  some people that complained, but not the entire

10  Department of Commerce complained about the work that

11  was done.

12           THE COURT:  But the issue is whether under

13  the guidelines the defendant should be held accountable

14  for the greater of the value of the payment or benefit

15  received.  Here isn't the profit the amount we have to

16  consider under the guidelines?

17           MR. SIMMS:  The guidelines state that it

18  should be the benefit that was paid or given to the

19  individual, and that would include a codefendant as

20  well.  That profit in this case would be the benefit.

21  But there is a threshold test for that, and that is

22  that it also has to be foreseeable to Mr. Conrad.

23           Now, this over million dollar profit, I will

24  submit, was not foreseeable at all.  Mr. Conrad was not

25  privy to Mr. Bedford's scheme and scam to submit these

1    false invoices.  It was never discussed.  As a matter

2    of fact, on the stand, Mr. Bedford testified that no

3    one knew except him about those inflated invoices.  He

4    didn't tell his workers.  He didn't tell his business

5    partner.  He did it on his own and hid it.

6          Now, Mr. Bedford, I would submit, is -- while

7    the jury may have taken some of his word, I would

8    submit to the Court that Mr. Bedford is also a master

9    of deception when it comes to the way he carries

10   himself and the way he conducts his business.

11         I will tell the Court a quick snippet that I

12   promise relates to this case.  When Mr. Bedford

13   testified, I saw an individual limping, barely making

14   it up to the stand, struggling with himself.  I set

15   there, and I watched him.  I felt sorry for him despite

16   the fact that I had information that I felt that he was

17   lying but just a sense of humanity.  Not only a month

18   later, I see that same individual, Mr. Bedford, down in

19   the probation office.  I didn't even recognize the man.

20   It was as if he had gained 20 years back on his life.

21         THE COURT:  I suppose he did.  Since he

22   didn't go to prison, I suppose he did.

23         MR. SIMMS:  I did hear about his sentence,

24   Your Honor.

25         In terms of the way that he carried himself,

9

1    the way that he conducted himself --

2              THE COURT:  Well, let's not go too far.  The

3    question is whether or not the $1 million loss amount

4    is appropriate under the guidelines, and I think I

5    understand your position.

6              MR. SIMMS:  Yes, Your Honor.  It was just

7    that it was not foreseeable to Mr. Conrad.

8              THE COURT:  All right.  Thank you.

9              MR. BURKE:  Your Honor, the government's

10   position is that the probation officer got it right,

11   both as to the guideline enhancement for high-level

12   decision-making official and as to the calculation of

13   the guideline loss.

14             Addressing first the issue of high-level

15   decision-making official, both the application note and

16   *Matzkin* make it abundantly clear that the test is not

17   whether or not the defendant has unilateral *de jure*

18   power to award a contract.  The test is merely whether

19   or not they have substantial influence, even if they

20   don't have authority, even if they don't have lawful,

21   legal authority.  Here, the proof at trial

22   overwhelmingly meets that test because it showed that

23   the defendant had complete power over this day

24   migration contract.  What the witness from SPAWAR

25   testified is Bedford's Images got hired because the

1  defendant told me to hire them.

2          It's not simply the initial hiring that he

3  influenced.  It's not a one-shot deal where it's just

4  the initial awarding of the contract.  It's the

5  continued performance over time of that contract over

6  months and months, long after it was apparent that

7  Bedford's Images shouldn't have been performing it.

8  The defendant controlled that, and he controlled that

9  unilaterally because he was the only person who was the

10 point of contact.  He was screening off other people in

11 the Department of Commerce from having direct

12 interaction with the contractor.  He continued to feed

13 them work, and he even went to bat and got yet more

14 money approved to pay them for even more work after --

15 long after it was clear.

16         So in terms of high-level decision-making

17 official, it's clear that the enhancement does apply.

18 It applies under the language of the application note,

19 and it applies under the Fourth Circuit's decision in

20 *Matzkin*.

21         Regarding the loss, again, Your Honor, for

22 purposes of the guidelines, the guidelines say that the

23 loss is the greater of several tests.  One of those

24 tests is the benefit received or to be received by the

25 bribe payer.  Here, again, we proved at trial that the

1  benefit received by the bribe payer was approximately

2  $1.1 million.  It's laid out to the penny in our

3  filing.  So that's the test under the sentencing

4  guidelines for loss.

5          In terms of the defendant's argument, Well, I

6  shouldn't be held accountable for that, the evidence

7  shows that he was intimately involved in the process.

8  He may not have known the precise penny of the amount

9  of the profit being made by Bedford's Images, but it

10  certainly was reasonably foreseeable to him.

11          He was the project manager.  He wrote the

12  scope of work.  He had access to the Bureau of Industry

13  and Security's budget.  He knew that he was soliciting

14  bribes and getting paid bribes, which he knows

15  Bedford's Images is only going to pay him if he's

16  providing them with something that is extremely

17  profitable.  Bribe schemes only work if everybody makes

18  out, if everybody profits.

19          The test is reasonable foreseeability, and

20  under the facts, it's clear that the fact that

21  Bedford's Images was going to profit and profit

22  handsomely was reasonably foreseeable to him.  So the

23  guideline loss --

24          THE COURT:  Is it uncommon in a conspiracy

25  for one member to know more than the other, to know

1   more about the details about how things are being done?

2   Is that uncommon in a conspiracy?

3          MS. CAIN:  It's very common.  In fact, it's

4   almost always the case that someone knows more than the

5   other participants.  So the guidelines recognize that,

6   and the case law recognizes that.

7          So under the reasonable foreseeability test,

8   it's clear he knew -- he was in a position to know that

9   Bedford's Images was profiting handsomely.  So that is

10  the appropriate loss calculation.  Now, that's the loss

11  under the guidelines.

12         If I may, Your Honor, I'd like to separately

13  address the question of loss for purposes of

14  restitution.  I can do that now, or I can do that

15  later.

16         THE COURT:  You can do it right now because I

17  have a question about that.  What has the government

18  lost here, if anything?

19         MR. BURKE:  The government's position is that

20  this case is no different than if by virtue of

21  corruption we paid for a high-end, top-of-the-line,

22  brand new Lamborghini and what we got by virtue of

23  corruption was a broken-down, rusted-out Ford.

24         THE COURT:  There's no evidence of that

25  whatsoever.  Nobody from the Bureau of Industry and

1  Security said that the work was no good, that they

2  didn't use the work.  They said they didn't like it.

3  They thought that the quality of it was poor, but the

4  government has not filed any False Claims Act claim

5  against this company; have they?

6          MR. BURKE:  Your Honor --

7          THE COURT:  Have you sought to recover any

8  money from Mr. Bedford at all?

9          MR. BURKE:  From Mr. Bedford, yeah.  We

10  obtained a forfeiture judgment from James Bedford in

11  the amount of $1.1 million.

12          THE COURT:  How much money have you

13  collected?

14          MR. BURKE:  I don't know what the total --

15          THE COURT:  Probably zero.

16          MR. BURKE:  That may be true, Your Honor, but

17  I don't think that that limits our ability to seek

18  restitution against all wrongdoers.

19          THE COURT:  My question about restitution has

20  to do with if the government has sustained some

21  financial loss, can you describe that to me.

22          MR. BURKE:  Yes, Your Honor.  The financial

23  loss is the difference between what we paid and the

24  value of what we actually got because the government is

25  entitled --

1          THE COURT:  What evidence do you have before

2    me of that?

3          MR. BURKE:  The evidence you have is the

4    evidence we presented at trial, which was the

5    calculation of -- the evidence showing, number one,

6    that we paid $1.1 million and what we got was product

7    that was of terrible quality.  And there were witnesses

8    who testified repeatedly that what they got was

9    worthless to them.  You heard that from Kim Sins.

10          THE COURT:  I did, but no one said, We sought

11    to fire Bedford's Images, we stopped paying invoices,

12    we brought suit against Bedford's Images.  Is that

13    right?

14          MR. BURKE:  That is correct.

15          And what you also heard from Ms. Sins in

16    particular was she took steps to stop any continued

17    expenditure of money through Bedford's Images and that

18    when she would be gone, the defendant would go behind

19    her back.

20          So what I'm saying, Your Honor, is we got a

21    rusted, broken-down Ford.  So we're entitled to get

22    what we paid for.  When there is a vast difference

23    between what we paid for and what we actually got, the

24    value of what we actually got and that is caused by

25    corruption --

```
 1              THE COURT:  It's $1 million according to you?
 2              MR. BURKE:  It's the figure set forth in our
 3  filings.  It's approximately $1.1 million, just shy of
 4  $1.1 million.
 5              THE COURT:  All right.
 6              MR. BURKE:  I think that addresses the --
 7              THE COURT:  I think it does.  I understand
 8  your position.
 9              MR. BURKE:  Thank you, Your Honor.
10              THE COURT:  I just want to make sure that I
11  didn't cut you off when you had something you wanted to
12  say.
13              MR. SIMMS:  No, Your Honor.  I think the
14  questions the Court raised with regards to the
15  restitution were the same questions that I had and also
16  raised by the probation office in the presentence
17  report.
18              I'll just say one thing, Your Honor:  The
19  government contends that they received -- they paid for
20  a Lamborghini and received a broken-down Chevy.  Yet,
21  no one within the Department of Commerce sought to seek
22  out the individual that sold them that broken-down,
23  beat-up Chevy.  Yet, they just used it.  That's what
24  happened in this case.  So the government doesn't know
25  the value of the loss.
```

1          THE COURT:  All right.  Let the record

2   reflect this matter is before the Court for sentencing.

3   The probation officer properly prepared the report.

4          There are two objections.  The first has to

5   do with whether or not the defendant qualifies for a

6   4-level enhancement under 2C1.1(b)(3) where he

7   allegedly was in a high-level decision-making or

8   sentencing position, and that includes having the

9   ability to either make the decision for, or on behalf

10  of, a government department, agency, or by substantial

11  influence of the decision-making process.

12         In this case, the defendant was an employee

13  of the Department of Commerce beginning in 2008 through

14  October 2011.  He was assigned to the Department of

15  Commerce's Bureau of Industry and Security, chief

16  information officer.  He at that time was a director of

17  Systems Operation and Security in the office.  He was

18  responsible for maintenance of the BIS's networks,

19  computer system design, and testing.  There was a

20  period in which the BIS computer network was infected

21  with a virus and had to be recreated, and they created

22  a data migration project.  The defendant was the

23  project manager for the data migration project.

24         The defendant had a personal family

25  relationship with Glen Bertrand, who was the partner of

1   Mr. James Bedford of Bedford's Images.  They also had a

2   company called Team America Contractors which had been

3   performing government contracts for construction but

4   not computer or IT contracts.

5            It's not clear to me when, but there was some

6   contact between the defendant and Bedford's Images of

7   Mr. Bedford and Mr. Bertrand which led Mr. Conrad to go

8   back to his agency knowing the contract would have to

9   be let to do data migration to recreate a new network

10  for the agency to suggest and to refer Bedford's Images

11  to SPAWAR.

12           SPAWAR is the agency in the Department of

13  Navy that handles contracts.  In this instance,

14  Department of Commerce would go to SPAWAR, and SPAWAR

15  had an ongoing contract with a company called Tridea

16  Works with a general contractor.  In this instance,

17  Mr. Conrad suggested to Mr. Kim Bryant, who was at

18  SPAWAR, that SPAWAR engage Bedford's Images to do the

19  data migration project.  And then Mr. Bryant suggested

20  to Tridea as prime contractor that they subcontract the

21  work to Bedford's Images.  And only Bedford's Images

22  then, I believe, subcontracted the work, in part, to

23  Team America Contractors.

24           The bottom line is SPAWAR had no reason to

25  know who Bedford's Images was or to give them a

1    contract except for the defendant's referral of them

2    and his suggestion, as the project manager, that this

3    was the entity he wanted to work with to do the work.

4    He worked with another company, but in this instance

5    for this contract, he sought to have Bedford's Images

6    receive the contract.

7            In my view, looking at the evidence that I

8    heard from Mr. Bryant, from the defendant's supervisor

9    at the agency, he, Mr. Conrad, was the principal

10   director as project manager.  He recommended the

11   contractor.  He dealt with the contractor, and the

12   contractor just happened to be Bedford's Images, which,

13   after the contract was awarded, that he sought the

14   bribes.

15           So in my judgment, in looking at the case

16   law, the *Matzkin* case the government cited deals with

17   the issue of influence.  In that case, Mr. Matzkin was

18   a supervisor engineer and involved with procurement.

19   He provided nonpublic information to the bribe payer

20   and recommended to a contract review panel that the

21   bribe payer receive the contracts.  The defendant

22   sought to ensure that certain contracts were awarded on

23   a sole-source basis without competition.  Here, this

24   contract was sole source, no competition.

25           The Fourth Circuit held that because the

1  engineer had the ability to pass nonpublic information

2  and to make a recommendation about who should be

3  awarded the contracts, that the enhancement applied.

4  In my view, that case controls here.

5          So the enhancement is properly applied, and

6  I'll overrule the objection.

7          The next issue has to do with the issue of

8  the amount of restitution, what should that be.  I'm

9  having trouble with the government's argument; that is

10  the government argues that here the contract profit was

11  $1 million and the defendant had received approximately

12  $208,000 in his bribes, in addition to another $7,800

13  for renovation work.

14          It would seem at first blush that the loss

15  amount should not be what the profit was.  But that's

16  not the law.  The law is that where you have a

17  conspiracy that the Court looks at reasonably

18  foreseeable behavior.  It's not uncommon in a

19  conspiracy for one conspirator to know more about the

20  work than the other.  Maybe conspirators don't even

21  talk about what's being done.  But here the conspiracy

22  involved bribery, and the bribery was for a government

23  contract.  The defendant may well not have known that

24  only $59,000 was spent on overhead for the $1 million

25  of profit.  The evidence before me is that the profit

1    amount was $1,079,161.02.  That's $1,079,161.02.

2             I'm persuaded that under the case law that

3    under 2C1.1(b)(2), the law requires the Court to impose

4    restitution.  It has to look at the greater of the

5    amount and value of the payment, the benefit received

6    or to be received, the value of anything obtained or to

7    be obtained by a public official or others acting with

8    the public official, or the loss to the government from

9    the offense to be used for the guideline calculation.

10            So in this case, Mr. Bedford testified he

11   received a $1 million profit as I just described.  So

12   for that reason, the guideline is appropriate, and the

13   objection is overruled.

14            Let me hear from the government on

15   sentencing.

16            MR. BURKE:  Your Honor, as you're well aware,

17   there are numerous factors to consider under 3553(a).

18   But in our view, the nature and circumstances of the

19   offense really drive an appropriate punishment in this

20   case.  What I mean by that, Your Honor, is that what we

21   have here is a protracted corruption conspiracy.

22            The government's position is that corruption

23   is different in kind than other routine forms of

24   financial crimes, because, like other financial crimes,

25   it wreaks financial havoc on the victims that it

1  touches.  But it's over and above and worse than that

2  in terms of not only quantity but in terms of quality.

3  It's significantly worse because it involves a breach

4  of trust, an abuse of power, and it cuts to the heart

5  of the rule of law, as we pointed out in the cases that

6  we cited in our sentencing memorandum.

7          Because when public officials use the power

8  that has been entrusted to them through our government,

9  which takes its legitimacy only by the consent of the

10  government, the rule of law itself breaks down.  When

11  public officials use their powers not to enforce the

12  law, not to carry into effect the policies and

13  administrative procedures that they are entrusted to do

14  but instead do it to put money in their pockets,

15  there's an abuse of trust.

16          And really, that calls for a significant

17  sentence to reflect how serious the crime is, to deter

18  this defendant, to deter other similarly situated

19  defendants, and to say to the public -- to re-instill

20  confidence in the public in the integrity of our

21  government.  Because if our government decays in this

22  manner, again, that cuts to the heart of the rule of

23  law.

24          I would also point out, Your Honor, that the

25  circumstances in this case were aggravated, to some

1    extent, by the defendant's decision to lie.  The

2    defendant has a right, of course, to say nothing.  He

3    has no obligation to cooperate with the government.

4    But if he chooses to speak, he does not have the option

5    to lie, and what we showed at trial through the

6    recorded conversation where he was interviewed by the

7    Department of Commerce Inspector General's Office was

8    when he was asked about his relationship with Team

9    America, he lied about it, which further aggravates the

10   offense.

11           I would also point out, Your Honor, that

12   there is a need for general deterrence in cases like

13   this.  What I mean by that is public corruption cases

14   are among the most difficult to prove because it

15   typically involves complex transactions that are

16   concealed.  It involves people who are in a position to

17   prevent the government from looking into them.  They

18   become -- they are among the most difficult cases to

19   prove.

20           Because they are difficult to prove, that

21   calls for a correspondingly stern and firm -- an

22   appropriately firm punishment because when cases such

23   as this, when crimes such as this are difficult to

24   detect, when the probability of detection is low, the

25   punishment needs to be commensurately stiff in order

1  for there to be sufficient deterrence.

2          I would also point out, Your Honor, that

3  these cases are particularly susceptible to general

4  deterrence because there is a defined set of potential

5  criminal actors, public officials, and public officials

6  out there in the world need to understand why this is

7  wrong and that if they commit such crimes, they will be

8  subjected to significant punishment.

9          Lastly, Your Honor, our position in terms of

10  unwarranted -- or avoiding unwarranted sentencing

11  disparities, as we've pointed out in our sentencing

12  memorandum, the best tool we have for trying to achieve

13  uniformity, for trying to ensure that similarly

14  situated offenders are treated similarly, which is

15  itself one of the factors that Your Honor is to

16  consider under the guidelines, is to impose a sentence

17  within the advisory guideline range.  Of course, the

18  guidelines --

19          THE COURT:  I wish you hadn't said that.  The

20  guidelines were intended to eliminate unwarranted

21  disparity, but they have done just the opposite.  They

22  have not eliminated race disparity.  If anything,

23  they've increased it.  The guidelines are not based on

24  any empirical research that the amount of punishment a

25  person receives will somehow deter them from committing

1  other crimes.  The guideline recommendations in these

2  cases involving loss amount have been increased for

3  political reasons several times in the last 10 years.

4          I understand why you say that, but the

5  guidelines are not based on any empirical research.

6  They've been discredited many times.  There's a book

7  called *Fear of Judging* by Judge Jose Cabranes which

8  does a detailed study of what the guidelines are.  They

9  are a law that I must consider, but do not talk to me

10  like they're the gospel because they're not.  They're

11  not the gospel.

12          MR. BURKE:  Your Honor, they're not binding

13  on Your Honor, and I completely agree with that.  You

14  are not required to follow them at all.

15          THE COURT:  I'm going to consider them but

16  don't come in here telling me that they are based on

17  some empirical research and that they are guidance that

18  every judge in America should impose the guidelines

19  blindly.  We're beyond that.  That book has come

20  forward now, and my discretion is back.  So I

21  appreciate your argument.  Is there more you want to

22  say?

23          MR. BURKE:  No, Your Honor.

24          THE COURT:  All right.  Thank you very much.

25          MR. SIMMS:  Your Honor, Mr. Conrad stands

1   before the Court convicted of two counts.  He's 43

2   years old.  He's never served a single day in jail.  He

3   has no criminal history whatsoever.  He's spent his

4   entire life in the Northern Virginia area.  His mother,

5   who is present today, is a federal employee.

6            THE COURT:  Where is his mother?

7            MR. SIMMS:  She is in the gallery.

8            THE COURT:  Thank you for coming to court

9   today.  He did this to himself.

10            THE DEFENDANT'S MOTHER:  I agree.

11            MR. SIMMS:  Your Honor, he was raised by his

12   mother and attended school and found himself in a

13   position in a federal agency and really was able to

14   work himself up at a young age and find himself in this

15   position because he was good at what he did.  He was

16   good with computers, and he excelled at it.  Even his

17   coworkers who stated that they may have not liked his

18   personality stated that he did good work.

19            Now, Mr. Conrad resides in the Northern

20   Virginia area with his wife and their children.

21            THE COURT:  Has he even told his family about

22   this offense yet?

23            MR. SIMMS:  His wife is aware of this

24   offense.

25            THE COURT:  Is she here?

1              MR. SIMMS:  She is not present, Your Honor.
2   I have spoken with her several times.  It is something
3   they are dealing with as a family.  In terms of other
4   family members, I am not aware of that.
5              In looking at Mr. Conrad's background, Your
6   Honor, and the need for deterrence, individually, for
7   an individual who has spent no time in jail, even a
8   period of 60 days in jail is a significant amount.  A
9   period of 2 years can be an eternity.
10             Now, the government talked about general
11  deterrence in regards to public officials that need to
12  be deterred from taking part in this type of criminal
13  activity.  A lot of those public officials are
14  similarly situated as Mr. Conrad with no criminal
15  history, have never served a day in jail.  So I'll
16  submit to this Court that a period of 2 years
17  incarceration is certainly a deterrent to those type of
18  individuals.
19             As far as for other crimes, an individual
20  kind of works their way up to that, based upon a
21  rotating door of coming in and out of jail, maybe 2
22  years wouldn't work.  But for individuals who have no
23  criminal history, have served their life in public
24  service, I would submit that 2 years is a sufficient
25  deterrent.

1          In respect to the unwarranted sentencing
2    disparity argument that the government attempted to
3    submit to the Court, they said that with no foundation.
4    When I say no foundation, it's not as though they
5    presented the Court with any other sentences that
6    reflect cases that are similar to Mr. Conrad,
7    defendants that are similar to him and what the Court
8    gave them.

9          Now, what I did -- and I submitted in my
10   sentencing memorandum -- is I pointed out one of the
11   more recognizable cases that's happening right now in
12   the federal system.  It's what they call the *Fat
13   Leonard* case dealing with the Navy and the individual
14   with the port in the Philippines.

15         Now, this case is currently being prosecuted
16   in the Southern District of California in San Diego.
17   The individuals in that case are receiving sentences
18   that -- the admiral, Robert Gilbeau, received an
19   18-month sentence.  Lieutenant Commander Genry Debord
20   received a 46-month sentence -- I'm sorry -- Linda Raja
21   received a 46-month sentence, and Lieutenant Commander
22   Debord received a 30-month sentence.

23         Now, that's a foundation, and that gives the
24   Court some guidance.

25              THE COURT:  Did you say California?

1          MR. SIMMS:  I did say California, Your Honor.

2          THE COURT:  You're in Virginia now.

3          MS. RUPERT:  I understand that.  I understand

4    that.  It's much different, but it's still the United

5    States, Your Honor.

6          THE COURT:  It is.  There's no doubt about

7    that.

8          MR. SIMMS:  Your Honor, so in using these

9    individuals -- and I submit to the Court that when

10   reading the allegations in this case, they far exceed

11   what happened or what the jury found happened with

12   Mr. Conrad.  The amount of gain in that case involved

13   over $35 million, which dwarfs the $1 million that

14   we're talking about here now.  It doesn't make it less

15   important, but in terms of numbers and when we're

16   talking about discrepancies, Your Honor, I just wanted

17   to submit that to the Court.

18         So with that being said and also my other

19   arguments I submitted in my position paper, Your Honor,

20   we are seeking a sentence of no more than 24 months.

21   We are seeking that Mr. Conrad be allowed to

22   self-surrender and that BOP designate him to a facility

23   as close to Northern Virginia as possible.

24         Your Honor, with respect to the restitution

25   amount, we vehemently object to the restitution amount

1  and that $1 million mark because the government has not

2  proven the loss amount in respect to restitution.

3          THE COURT:  All right.  Mr. Conrad, would you

4  come to the podium with your lawyer, please.

5          Good morning.

6          THE DEFENDANT:  Good morning, sir.

7          THE COURT:  Mr. Conrad, is there any

8  statement you want to make on your own behalf?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  Well, actually, before you do

11  that, let me make one observation.  Mr. Conrad, you

12  went to trial on a plea of not guilty.  You have the

13  absolute right to appeal the judgment I'm about to

14  enter today to the United States Court of Appeals for

15  the Fourth Circuit.  If you decide to appeal, you must

16  file a written notice of appeal within 14 days of

17  today's date.  You may engage Mr. Simms or any other

18  counsel of your choice to represent you on your appeal.

19  If no notice of appeal is filed within 14 days of

20  today's date, you lose your right to appeal.

21          Do you understand?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  All right.  Now.

24          THE DEFENDANT:  Thank you, sir.

25          You know, you made a comment, and it kind of,

1   you know, set the stage.  You were correct that what I

2   did was by my own volition and my own action, but what

3   I did not do, Your Honor, was ask for a bribe from

4   Mr. Bedford.  I did ask him to ask Glen Bertrand

5   specifically for a loan to help my father-in-law with

6   his store, one that I didn't own.  I didn't seek

7   financial gain for myself.  And the government is

8   correct.  You cannot have public servants going out and

9   enriching their own pockets at the expense of

10  government contracts, but I didn't do any of that.

11  Bedford sat on that stand, and he lied, and the

12  government allowed him to lie.

13          One of the things that they mentioned in the

14  trial that we had -- and it was discussed for days,

15  probably a day and a half -- was the close proximity to

16  the dates in which the checks were received by

17  Bedford's Images or Team America and the dates in which

18  the checks were received by me.  There is no doubt that

19  they paid me $200,000, but it was simply in exchange

20  for helping them open the restaurant.  That's what the

21  money was for.  There was no corrupt intent or corrupt

22  purposes in relation to this.

23          Henry Hodor stated that he never talked to

24  me.  So I would never have known the date in which the

25  checks were sent out.  Bedford said he never saw me and

1   I just showed up with some fictitious invoices.  Well,

2   then why would the dates on the checks and the dates on

3   the invoices be two days apart?

4               THE COURT:  Mr. Conrad, this sounds like a

5   closing argument from your trial for which you did not

6   testify, as you had the right to do.  While I

7   appreciate your wanting to tell me your view of what

8   happened, I can only consider the facts that were

9   presented at trial.  At trial you exercised your right

10  under the Fifth Amendment.  So I'm not sure what I'm

11  supposed to do with this.

12              THE DEFENDANT:  I understand.  It's just a

13  frustrating experience, Your Honor, to having never

14  been anywhere near a criminal court other than I think

15  I had a 80-mile-an-hour in a 60-mile-an-hour zone or

16  something like that and to know that you didn't do it.

17  And you're here and you didn't do it, and you don't

18  have a way out.  There is no way to do anything other

19  than to say that.

20              I am sorry for anything that I did, my

21  actions with the government.  I accepted my

22  responsibility in September 2011.  I resigned my

23  position.  I admitted what I did to the government.  I

24  admitted that at that point that what I did was

25  unethical by asking them that.  I agreed, and I left.

1 But I did not ask him for a bribe.  I don't know how

2 else to defend it.  I don't know what else to say.  I

3 don't know what else to do.  I didn't do it.

4          So I understand what you're saying.  Sorry

5 for taking up so much of your time.

6          THE COURT:  No.  My job is to listen to you

7 and listen to your lawyer and allow you to have a

8 trial, which you did.  Now I'm just trying to decide

9 what to do.

10         Have you completed your statement?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  I'm not trying to cut you off.

13 If there's more you want to say, this is your chance.

14         THE DEFENDANT:  No.  No.  I mean, it's as you

15 said.  There's nothing that I can say now that would

16 sway your opinion or make it any different.  It didn't

17 happen at trial.  I don't know what else to do.  I

18 followed recommendations of people, and I am where I

19 am.  I did what I did.  If I should be punished for

20 that, then so be it.

21         THE COURT:  All right.  Mr. Conrad, you're

22 before the Court having been found guilty of the

23 offense of conspiracy to commit bribery and acceptance

24 of bribes by a public official.

25         I heard the whole trial, as you did, and it

1  was evident to me that you were an IT professional who

2  had responsibility for the data migration project, and

3  it was not out of the clear blue sky that James Bedford

4  at Bedford's Images was selected for this contract.

5  You, as project manager, and only you recommended

6  Bedford's Images to receive the work, and only you made

7  a recommendation that SPAWAR use Bedford's Images.

8  There was no competition, just a sole-source contract,

9  and Bedford was the owner of Team America Contractors

10  and Bedford's Images.

11        Before this, Team America was doing

12  construction work and build-outs of office space.

13  Their venture into data migration was basically because

14  you suggested them and gave them an opportunity.  Now,

15  Mr. Glen Bertrand is not before the Court.  I know

16  there's some personal relationship between you and

17  their family.  He is not a subject of this indictment,

18  and the evidence at trial did not really involve him.

19        But the false invoices were presented by you.

20  Those false invoices did not come out of the clear blue

21  sky.  Yes, you may have asked Mr. Bertrand for a loan.

22  But what I heard was that invoices were presented, and

23  Mr. Bedford paid them.  You didn't give the money back,

24  and you never paid the money back.  So it does not

25  matter to me what I think.  What's important is what

1 that jury thought.  That jury heard all the evidence,

2 and they decided you were guilty of the offense.

3       The jury, who is randomly selected from our

4 community, heard all the evidence, and their judgment

5 was and mine is that you were a corrupt government

6 official in government contracting who steered this

7 contract to a coconspirator in order to receive bribes.

8 So you cheated the taxpayers out of what we were

9 entitled to from a high-ranking official, and that is

10 our tax dollars to be used for services that are

11 rendered based on the contract price without the

12 government official awarding the contract in order to

13 receive some bribe.

14       This is a case of bribery.  It is not a False

15 Claims Act case.  The government has not brought any

16 suit against Bedford's Images or Team America

17 Contractors to recover back the $1 million Mr. Bedford

18 made in the contract.  It's not unusual.  He only spent

19 $60,000 on software and salaries to staff the project,

20 and the work was not really good work at all.  But the

21 only information I have is that he made a million

22 dollars.  That's what he testified to, and that's what

23 was before the jury.

24       So I conclude the loss amount was properly

25 calculated.

1        I think that concerning the sentencing
2   guidelines -- don't misinterpret my statement about the
3   guidelines as an authority.  I think that in this case
4   they would be excessive, 121 months to 151 months would
5   be excessive given the nature of the offense.  This is
6   not an offense where you stole $1 million from the
7   treasury, went out to the Bahamas on vacation or took
8   it to Las Vegas and gambled.  Rather, you received
9   perhaps $225,000, $230,000 based on your renovation
10  costs and bribes from Mr. Bedford.
11        You are 43 years old with no prior record,
12  and I think you're a low risk for recidivism given your
13  age, marital status, and lack of prior record.  I think
14  the loss amount does not proportionately reflect the
15  nature of the offense.  I've sentenced many individual
16  cases involving white-collar crimes of bribery.  This
17  one does not merit a guideline sentence given the
18  nature of the evidence which I have heard in this trial
19  and the elementary scheme of submitting false invoices
20  to the codefendant in order to obtain payments.
21        My judgment is that you be incarcerated for a
22  term of imprisonment of 48 months.  You will be placed
23  on a 2-year term of supervised release.  I'll not
24  impose any fine because the defendant does not have any
25  cash to pay a fine once he's incarcerated.  He was

1   making a meager income at the time of this trial, so he

2   really has no asset to pay a fine, cost of

3   incarceration, or cost of supervision.

4          I'll suspend the mandatory drug testing

5   requirement because I've seen no indication that you

6   have a problem with substance abuse.  That does not

7   prevent the probation officer instituting drug testing

8   and treatment if it deems it appropriate.

9          I will impose a $200 special assessment to be

10  paid right away.

11         The restitution amount is the amount I

12  referred to earlier, which is $1,079,161.02, which is

13  joint and several between you and Mr. Bedford.  You

14  both will be required to pay those costs.

15         You're not to open any new lines of credit

16  without the approval of the probation officer.  You'll

17  be required to provide the probation officer with

18  access, if requested, to financial information and be

19  required to apply any tax refunds or if you win the

20  lottery or inheritance or unanticipated financial gain,

21  you apply that to the restitution amount.

22         I will not impose any fine or cost of

23  incarceration.

24         The $200 special assessment has to be paid

25  right away.

1          Do you all have a restitution order?

2          MR. BURKE:  We do, Your Honor.

3          THE COURT:  Yes.

4          MR. BURKE:  Just to clarify, Your Honor, are

5    you speaking about restitution or about forfeiture?

6          THE COURT:  Restitution.

7          MR. BURKE:  I have orders for both, Your

8    Honor.

9          THE COURT:  All right.

10       (Documents are handed up to the Court.)

11         THE COURT:  So 48 months each count

12   concurrent.

13         MR. SIMMS:  Your Honor, the Court has

14   indicated the amount for the restitution order and that

15   it be joint and several.  Is it possible for the Court

16   to apportion between Mr. Conrad and Mr. Bedford the

17   amounts?

18         THE COURT:  I understand why you want me to

19   do that, but I don't think I can.  I don't think I have

20   the authority to do that.  If the Court of Appeals were

21   to tell you later that I have the authority to do that,

22   then I think another judge will do that.

23   Coconspirators are jointly and severally liable for the

24   full amount.

25         MR. SIMMS:  Your Honor, I do have a case that

1    states that you do have authority to do that.

2            THE COURT:  Well, you'd have to give it to me

3    and let me read it before I can make that judgment.   If

4    you want me to reserve on that, I'll reserve on that

5    aspect of it.  But you give me the case.  I don't have

6    the case.

7            MR. SIMMS:  Okay.  I will.

8            THE COURT:  Please let the government have

9    the case as well.  So I'll hold off on signing the

10   restitution order.

11           Was there an objection to the forfeiture

12   order?

13           MR. BURKE:  There was no objection to the

14   forfeiture order.

15           THE COURT:  All right.  Have you seen the

16   forfeiture order, Mr. Simms?

17           MR. SIMMS:  Yes.

18           THE COURT:  Thank you.

19           You are to voluntarily report.

20           You all are excused.

21           Let me just make this observation:

22   Mr. Simms, I was considering making a specific

23   recommendation, and I wanted to know if you had any

24   comment.  I was thinking that he might want to go FCI

25   Cumberland, Maryland, or Morgantown, West Virginia.

 1   I'm happy to recommend Petersburg if that's your

 2   preference.

 3              MR. SIMMS:  Your Honor, I believe Cumberland

 4   would probably be the better option.

 5              THE COURT:  All right.  Thank you very much.

 6              You all are excused.

 7              Provide your case to me, if you would,

 8   promptly.

 9              MR. SIMMS:  I will, Your Honor.  Thank you.

10              THE COURT:  Thank you.

11              -----------------------------------
                          Time:  10:58 a.m.

12

13

14

15

16

17

18

19

20

21
          I certify that the foregoing is a true and
22
      accurate transcription of my stenographic notes.
23

24

                                      /s/
25                      Rhonda F. Montgomery, CCR, RPR